**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| MAHMUD U. HAQ, | |
| Plaintiff, | |
| v. | Civil Action No. 19-10553 (MAS) (ZNQ) |
| NATIONWIDE LIFE AND ANNUITY INSURANCE COMPANY, et al., | **MEMORANDUM OPINION** |
| Defendants. | |

**SHIPP, District Judge**

This matter comes before the Court upon Defendant Newport Group, Inc.'s ("Newport") Motion to Dismiss Plaintiff Mahmud U. Haq's ("Plaintiff") Second Amended Complaint. (ECF No. 78.) Plaintiff opposed (ECF No. 82), and Newport replied (ECF No. 84). The Court has carefully considered the parties' submissions and decides this matter without oral argument pursuant to Local Civil Rule 78.1. For the reasons set forth below, Newport's Motion to Dismiss the Second Amended Complaint is denied.

I.    **BACKGROUND**[1]

The parties are familiar with the factual and procedural history of this matter, and therefore the Court only recites those facts necessary to resolve the instant motion. The Court previously granted Newport's Motion to Dismiss Plaintiff's First Amended Complaint ("FAC") in this matter

---

[1] For the purpose of this motion to dismiss, the Court accepts the factual allegations in the Second Amended Complaint as true and draws all inferences in the light most favorable to Plaintiff. *See Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 228 (3d Cir. 2008).

while granting Plaintiff leave to file a Second Amended Complaint ("SAC"). (Feb. 29, 2020 Op. 17-21, ECF No. 58.)

From approximately 1997 to 1999, Plaintiff was the Chief Executive Officer and President of Compass, "a collection agency specializing in managing accounts receivable, mailing[,] and telemarketing." (SAC ¶ 10, ECF No. 65.) On or about May 14, 1999, Compass was acquired by NCO Group, Inc. ("NCO"). (*Id.*) As a result of the acquisition, Plaintiff was entitled to receive a lump sum cash payment as part of a severance package. (*Id.*)

### A. The Policy

In lieu of the lump sum payment, "NCO aggressively marketed an alternative to a cash payment." (*Id.* ¶ 11.) NCO offered, and Plaintiff accepted, a variable life insurance policy instead of the lump sum payment (the "Policy"). (*Id.* ¶¶ 11-17.) Nationwide Life and Annuity Insurance Company ("Nationwide") was the insurance provider of the Policy. (*Id.* ¶ 15.) In such a policy, "premiums are managed in a separate investment account for the benefit of the insured." (*Id.* ¶ 16.) The death benefit payout to the insured, therefore, "depends on the performance of the insured's investment account." (*Id.*) For the value of the Policy to increase, it is "critical that there are substantial sums invested in the investment account—and that the investments are managed well— for the Policy value to grow." (*Id.*) NCO proposed that it "would pay the Policy premiums in advance in exchange for the future repayment of [the] advanced premiums through an interest in the Policy's cash value and death benefits" (the "Split-Dollar Agreement"). (*Id.* ¶ 11.) On August 20, 1999, NCO and Plaintiff entered into an agreement formalizing the split-dollar arrangement. (*Id.* ¶ 17.)

The SAC alleges that "NCO engaged Newport to promote the merits of the split-dollar arrangement to [Plaintiff] and other departing Compass executives and to sell variable life

2

insurance policies to these executives. In turn, Newport acted as the agent and administrator for the insurance policies that were sold." (*Id.* ¶ 13.) According to Plaintiff, it was Newport that "pitched Nationwide to [him] as the insurance provider[.]" (*Id.* ¶ 15.) "As part of the sales pitch, Newport provided [Plaintiff] with financial illustrations projecting that the Policy could be worth over $5,700,000 by the start of 2018." (*Id.* ¶ 14.) On or about August 20, 1999, Nationwide approved and issued the Policy, (*id.* ¶ 15), and in a "Welcome Package" dated August 4, 2000, Newport provided these value projections to Plaintiff, (*id.* ¶ 14). "As the policy administrator, Newport committed to providing to [Plaintiff] ongoing administrative and financial services as detailed in the 'Implementation Manual' that Newport sent to [Plaintiff] which included providing quarterly 'Asset Value Reports,' an annual financial assessment, and an annual calculation of the economic benefit attributable to [the] Policy." (*Id.* ¶ 14.)

In accordance with the Split-Dollar Agreement, the Policy was funded through the payment of advanced premiums ("the Advanced Premiums") by NCO. (*Id.* ¶ 17.) The Advanced Premiums were paid in four annual installments of $350,000 for a total of $1,400,000. (*Id.*) According to Plaintiff, "[a] key selling feature of the arrangement was that NCO's initial payment of the premiums would make the Policy self-sustaining and that [Plaintiff] would never need to pay any premiums for the [P]olicy." (*Id.* ¶ 12.) Other than NCO's right to recoup the total value of the Advanced Premiums, Plaintiff retained all rights to the Policy. (*Id.* ¶ 17.) After a three-year waiting period, Plaintiff was permitted to request a loan against the Policy from Nationwide, provided the loan amount would "not reduce the unencumbered cash surrender value[2] in the Policy below the amount necessary to sustain [a] death benefit under the Policy equal to the sum of [] the

---

[2] While not defined by the parties, the "cash surrender value" is "the value the policyholder receives if the policy is surrendered prior to death." *Buck v. Am. Gen. Life Ins. Co.*, No. 17-13278, 2018 WL 5669173, at *1 (D.N.J. Oct. 31, 2018).

3

Advanced Premiums" and the aggregate balance on the loan. (*Id.* ¶ 19.) The amount available for a loan against the Policy was to be "determined and redetermined annually[.]" (*Id.*) Plaintiff believed that "if the Policy had sufficient value, he would be able to borrow against it without jeopardizing the underlying requirements that the Policy be both self-sustaining and sufficient to repay the Advanced Premiums." (*Id.* ¶ 20.)

### B.    The Collateral Assignment

On or about August 20, 1999, Plaintiff and NCO entered into a collateral assignment (the "Collateral Assignment") whereby Plaintiff granted NCO a security interest in the Policy as collateral for Plaintiff's obligation to repay the Advanced Premiums. (*Id.* ¶¶ 21-22.) Plaintiff, NCO, and Nationwide agreed that no loans that could "jeopardize [Plaintiff's] obligation to repay the Advanced Premiums would be permitted[.]" (*Id.* ¶ 22.) The Collateral Assignment further required NCO to review any loan request submitted by Plaintiff. (*Id.*)

The Collateral Assignment was received and recorded by Nationwide (the "Nationwide Acknowledgment") on January 17, 2000. (*Id.* ¶ 24.) The Nationwide Acknowledgment confirms Nationwide is "responsible for enforcing the terms of the Collateral Assignment that are relevant to [the SAC]." (*Id.*) It further includes a provision that requires the signatures of both Plaintiff and a representative from NCO to process any loan taken against the Policy. (*Id.*) On or about August 4, 2000, Newport included a copy of the Nationwide Acknowledgment and the Collateral Assignment in the welcome package sent to Plaintiff. (*Id.* ¶ 25.)

### C.    The Loan

On or about January 30, 2013, Plaintiff sought to take out a loan against the Policy (the "Loan") and was provided, by Nationwide, with a form entitled, "Loan, Partial Surrender and Dividend Withdraw Request." (SAC ¶ 26.) The form offered Plaintiff three options for the loan

4

amount: two options to borrow the "Maximum Amount Available," each with a different financing schema, and one option to request a loan in a specific amount, as chosen by Plaintiff. (*Id.*) Nationwide informed Plaintiff that "Nationwide (not [Plaintiff]) would be determining the maximum amount that could be borrowed under the Policy." (*Id.*) Plaintiff, accordingly, chose one of the "Maximum Amount Available" options. (*Id.* ¶ 27.) Plaintiff alleges that he relied on Nationwide and Newport to ensure that any loans that were issued would not violate restrictions under the relevant agreements. (*Id.* ¶ 39; *see also id.* ¶ 27.) Plaintiff asserts that he "did not question Nationwide's and Newport's collective determination, and reasonably relied on them to make the correct determination in accordance with the restrictions in the Policy, Split-Dollar Agreement[,] and Collateral Assignment." (*Id.* ¶ 28.) Moreover, according to Plaintiff, "Nationwide and Newport represented to [Plaintiff] that they were experts in maintaining and administering the Policy they created and sold to him." (*Id.*)

The Loan, a total of $1,218,520, was approved and processed by Nationwide as of January 31, 2013. (*Id.* ¶ 29.) Because Defendants never referenced the limitations of the Collateral Assignment when discussing the Loan with Plaintiff, Plaintiff believed the "Loan was permitted" and "had been properly reviewed by Defendants for compliance" with the relevant agreements. (*Id.* ¶ 30.) The Nationwide Agreement required Nationwide to secure the signatures of both Plaintiff and EGS, NCO's successor-in-interest, to confirm a loan taken against the Policy, but Plaintiff alleges Nationwide never obtained EGS's signature. (*Id.* ¶ 31.)

Plaintiff asserts that Defendants' collective "blind approval" of the Loan "far exceeded the amount permitted under the Collateral Assignment and was a plain violation of its terms, which left the Policy unable to maintain requisite coverage under the Collateral Assignment." (*Id.* ¶ 53.) Accordingly, Plaintiff alleges that Newport, with Nationwide and EGS, breached their obligations

to Plaintiff "through a course of conduct that gutted the value of the Policy, ... imperiled [Plaintiff's] ability to repay the loan, wiped out any personal value of the Policy to [Plaintiff] or his estate, and saddled [Plaintiff] with an ongoing obligation to pay substantial premiums to maintain the Policy." (*Id.* ¶ 1.) Immediately preceding the approval of the Loan, the Policy had a "cash surrender value" of approximately $1,341,069. (*Id.* ¶ 33.) Subsequent to the Loan, the Policy's cash surrender value was reduced to approximately $130,000. (*Id.*) "This meant ... only $130,000 was left to be invested in securities. The amount of $130,000 was wholly insufficient to generate investment returns to offset the recurring Policy premiums and fees that [Plaintiff] paid to Nationwide and Newport." (*Id.*)

On or about April 8, 2013, Plaintiff's counsel sent e-mail correspondence to Nationwide requesting information regarding "the terms and repayment information for the [Loan]." (*Id.* ¶ 36.) Nationwide responded the same day stating, in part, "[t]here is no repayment requirement. As long as the [P]olicy has enough cash value to cover monthly deductions there is no repayment for funds to be paid, unless desired." (*Id.*) Nationwide did not disclose that "because of the [Loan] . . . , there [in fact] was a repayment requirement under the Policy pursuant to the terms of the Collateral Assignment." (*Id.* ¶ 37.) Nationwide further failed to disclose that because of the loan, "the amount invested to grow the Policy's value would be limited to the Policy's cash surrender value of less than $130,000, an amount insufficient to generate returns necessary for Nationwide and Newport to be paid for future premiums, fees[,] and interest charges." (*Id.* ¶ 37.)

Plaintiff maintains Newport "was put on specific notice as to the existence of the [Loan] shortly after the loan was made." (*Id.* ¶¶ 38, 65.) Furthermore, according to Plaintiff, the "insurance agent of record at Newport ... conceded that had he been consulted by [Plaintiff] about the [Loan], he would have warned [Plaintiff] of the severe consequences" the Loan would have on

the Policy. (*Id.* ¶ 38.) Nevertheless, Plaintiff alleges that no Newport personnel "attempted to contact [him] to explain or discuss the disastrous consequences that the [Loan] would have on the Policy," or to inform him that the Loan "was in contravention of the terms of the Collateral Assignment." (*Id.* ¶ 65.) Indeed, according to Plaintiff, "the annual and periodic statements provided by Nationwide and Newport . . . during the years following the [Loan] are grossly misleading and inadequate to inform [Plaintiff] of the deleterious effect of the [Loan]." (*Id.* ¶ 40.) Plaintiff asserts that "as late as the Fall of 2017, when the actual policy cash surrender value had been whittled down to approximately $3,000, Nationwide's annual statement for the period of October 4, 2016 – October 3, 2017 states prominently that [Plaintiff's policy value] is $1,418,517.12 and Death Benefits are $5,606,178.04." (*Id.* ¶ 41.) In or about November 2016, after the $130,000 had been exhausted, Plaintiff learned of the financial impact the Loan had on the Policy. (*Id.* ¶¶ 33, 35, 47.) Plaintiff maintains that had he been "duly informed and educated by any one of the Defendants," he could have taken steps to promptly repay the Loan so that the Policy would have retained as much of its original value as possible. (*Id.* ¶ 44.)

On April 30, 2019, Plaintiff filed an Amended Complaint that included claims against Newport for breach of contract, breach of the covenant of good faith and fair dealing, negligence, and breach of the duty of care. (Feb. 29, 2020 Op. 17-20.) The Court dismissed each of those claims, finding that the Amended Complaint was "devoid of allegations that Plaintiff and Newport ever entered into a contractual relationship together, or that Plaintiff was an intended third-party beneficiary of a contract to which Newport was a party." (*Id.* at 18.) Furthermore, the Court found that Plaintiff "fail[ed] to allege that Newport had any legal duty to take the actions for which Plaintiff seeks to hold it liable." (*Id.* at 20.) Nevertheless, the Court granted Plaintiff leave to file a Second Amended Complaint. (*Id.*)

7

On May 11, 2020, Plaintiff filed a Second Amended Complaint. (ECF No. 65.) The SAC asserts one count of each of the following claims against Newport: breach of contract, (*id.* ¶¶ 48-55), breach of the covenant of good faith and fair dealing, (*id.* ¶¶ 56-59), and negligence, (*id.* ¶¶ 60-67).[3] In the motion now before the Court, Newport moves to dismiss Plaintiff's claims against it.

## II. LEGAL STANDARD

"Federal Rule of Civil Procedure 8(a)(2) requires only 'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)).

District courts undertake a three-part analysis when considering a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6). *Malleus v. George*, 641 F.3d 560, 563 (3d Cir. 2011). "First, the court must 'tak[e] note of the elements a plaintiff must plead to state a claim.'" *Id.* (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 675 (2009)). Second, the court must accept as true all of the plaintiff's well-pled factual allegations and "construe the complaint in the light most favorable to the plaintiff." *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009). In doing so, the court is free to ignore legal conclusions or factually unsupported accusations that merely state, "the-defendant-unlawfully-harmed-me." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 555). Finally, the court must determine whether "the facts alleged in the complaint are sufficient to show that the plaintiff has a 'plausible claim for relief.'" *Fowler*, 578 F.3d at 211

---

[3] Although the SAC asserts claims against other Defendants, those parties have not joined the instant motion.

8

(quoting *Iqbal*, 556 U.S. at 679). "The defendant bears the burden of showing that no claim has been presented." *Hedges v. United States*, 404 F.3d 744, 750 (3d Cir. 2005).

While, as a general rule, the court may not consider anything beyond the four corners of the complaint on a motion to dismiss pursuant to Rule 12(b)(6), the Third Circuit has held that "a court may consider certain narrowly defined types of material without converting the motion to dismiss [to one for summary judgment pursuant to Rule 56]." *In re Rockefeller Ctr. Props. Sec. Litig.*, 184 F.3d 280, 287 (3d Cir. 1999). Specifically, courts may consider any "document integral to or explicitly relied upon in the complaint." *In re Burlington Coat Factory Secs. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997) (emphasis omitted).

## III. DISCUSSION

### A. Breach of Contract/ Covenant of Good Faith and Fair Dealing

To state a breach of contract claim, a plaintiff must allege "(1) a contract between the parties; (2) a breach of that contract; (3) damages flowing therefrom; and (4) that the party stating the claim performed its own contractual obligations." *Frederico v. Home Depot*, 507 F.3d 188, 203 (3d Cir. 2007). "In express contracts, parties have stated their terms; in implied contracts the parties' have not stated their terms, and instead, the agreement is manifested by the parties' conduct." *Ricketti v. Barry*, No. 13-6804, 2015 WL 2376013, at *2 (D.N.J. May 18, 2015). "A contract that is implied-in-fact is in legal effect an express contract and varies from the latter only insofar as the parties' agreement and assent thereto have been manifested by conduct instead of words." *Faceton, Inc. v. Comp. Care Partners, LLC*, No. 13-6765, 2014 WL 6685380, at *8 (D.N.J. Nov. 26, 2014) (internal quotation omitted). "In order for a valid contract to exist, a plaintiff must establish: (1) a meeting of the minds, (2) an offer and acceptance, (3) consideration,

9

and (4) reasonably certain contract terms." *Northstar Marine, Inc. v. R&A Marine, LLC*, No. 12- 4438, 2013 WL 3873232, at *2 (D.N.J. July 25, 2013).

As Defendant's moving brief notes, unlike the FAC, the SAC cites to the Implementation Manual attached to the "Welcome Package" sent by Newport to Plaintiff. (Def.'s Moving Br. 12, ECF No. 78-1.) In a section of the Implementation Manual headed "Clients Come First," Newport represented to Plaintiff that it "will be administering the plan for Mahmud U. Haq." (Implementation Manual *9, Welcome Package, Ex. A to SAC, ECF No. 65-1.) According to the Implementation Manual, Newport's administrative activities would include: "review of current plan design, product performance, and the projected financial results associated with each plan being administered by Newport Group," (*id.* *11); "the coordination of annual billings, policy service procedures, . . . and the tracking of plan additions, increases, terminations and retirements," (*id.*); and "preparation and transmittal of all corporate and individual insurance forms and applications" (*id.* *12). The SAC also alleges that "Newport was paid directly from the proceeds of the Policy" and "has received tens of thousands of dollars in fees." (SAC ¶ 15.)

Construing the facts in the light most favorable to Plaintiff, the Court agrees that Plaintiff has adequately pleaded the existence and elements of a contract between Plaintiff and Newport. The Welcome Package and the attached Implementation Manual constitute reasonably certain contract terms between the parties. Newport's delivery of the Welcome Package and Implementation Manual to Plaintiff, its administration of the agreements at issue in this case, along with Plaintiff's acquiescence to Newport's receipt of the Policy's proceeds as fees, would constitute a meeting of the minds, offer and acceptance, and consideration. To the extent Newport argues another party other than Plaintiff actually paid it for its services, the Court finds that this is a question of fact to be determined after further development of the factual record. At present,

Plaintiff's assertion that (1) he retained rights to the proceeds of the Policy and (2) that "Newport was paid directly from the proceeds of the policy" is a sufficient allegation that Plaintiff gave Newport consideration. (*See* SAC ¶ 17 ("The Split-Dollar Agreement provided that [Plaintiff] retained all rights to the Policy, except that NCO would have the right to be repaid the Advance Premiums").)[4]

Furthermore, the Court finds that Plaintiff has adequately alleged a breach of the implied contract between itself and Newport. Plaintiff alleges that "Newport committed to providing to [Plaintiff] ongoing administrative and financial services as detailed in the 'Implementation Manual[.]'" (*Id.* ¶ 14.) Plaintiff alleges that his implied contract with Newport obligated "Newport to ensure that any loans that were issued would not violate restrictions under [the relevant agreements], or cripple the value of the Policy or otherwise jeopardize the underlying requirements that the Policy remain both self-sustaining and sufficient to repay the Advance Premiums." (*Id.* ¶ 39.) Based on the foregoing allegations, the Court finds that Plaintiff has plausibly alleged breach of contract claims and given Newport fair notice of the grounds upon which his claims rest.

---

[4] Newport argues that "in both the FAC and the SAC, Plaintiff pleaded that Newport was the administrator for the Policy and agreed to provide administrative services associated with the Policy." (Def.'s Moving Br. 2 (citing FAC ¶¶ 40, 74, 86).) Furthermore, Newport notes that the "Welcome Package" and its included Implementation Manual were also attached to the FAC. (*Id.* at 12.) Newport suggests that the Court should apply the law of the case doctrine to preclude Plaintiff from relying on allegations previously set forth in the FAC. (*Id.* at 14.) As Newport's moving brief notes, however, unlike the FAC, the SAC cites the Implementation Manual sent by Newport to Plaintiff, rather than Plaintiff merely attaching it to the SAC. (Def.'s Moving Br. 12.) The Court finds that the SAC's explicit citation to the Implementation Manual, combined with other added factual assertions regarding both consideration and Newport's alleged commitments "to keep him informed about material aspects of the Policy, including material changes in the value of the Policy," (SAC ¶ 46), are new factual allegations that make the law of the case doctrine inapplicable to the case at bar. *See Emerson Radio Corp. v. Yu*, No. 20-1618, 2021 WL 1186824, at *2 (D.N.J. Mar. 30, 2021) ("In the case of a motion to dismiss, the law of the case doctrine does not apply where 'new allegations have been made which change the nature of the record and place it in an altogether different state than it was in at the time the Court decided the issue at hand.'" (quoting *Farmer v. Lanigan*, No. 12-5716, 2016 WL 4107693, at *3 (D.N.J. Aug. 1, 2016))).

11

*Twombly*, 550 U.S. at 555 (2007) (citing *Conley*, 355 U.S. at 47). "Implication of a contractual agreement from the circumstances, the contours of good faith performance, and the scope of any promises or reasonable reliance, are all fact-bound issues. They cannot be resolved at this, the pleading stage." *Read v. Profeta*, No. 15-2637, 2016 WL 8679223, at *5 (D.N.J. Apr. 15, 2016).

### B. Negligence

Negligence "has four elements: '(1) [a] duty of care, (2) [a] breach of [that] duty, (3) proximate cause, and (4) actual damages[.]'" *Shtutman v. Carr*, No. A-1093-15T1, 2017 WL 4402045, at *10 (N.J. Super. Ct. App. Div. Oct. 4, 2017) (alterations in original) (quoting *Polzo v. Cnty. of Essex*, 960 A.2d 375, 584 (2008)). New Jersey state courts have held that:

> Whether a person owes a duty of reasonable care toward another turns on whether the imposition of such a duty satisfies an abiding sense of basic fairness under all of the circumstances in light of considerations of public policy. That inquiry involves identifying, weighing, and balancing several factors—the relationship of the parties, the nature of the attendant risk, the opportunity and ability to exercise care, and the public interest in the proposed solution.

*Id.* at *8 (quoting *Hopkins v. Fox & Lazo Realtors*, 625 A.2d 1110, 1116 (N.J. 1993)). Moreover, "'[o]ne who holds himself out to the public as [a professional] is required to have the degree of skill and knowledge requisite to the calling,' and to exercise it." *Id.* (second alteration in original) (quoting *Carter Lincoln–Mercury, Inc. v. EMAR Grp., Inc.*, 638 A.2d 1288, 1291 (N.J. 1994)). Furthermore, "[t]he professional's 'duty is defined not by the contractual relationship between the parties but by considerations of foreseeability and fairness.'" *Id.* (quoting *Carter Lincoln–Mercury*, 638 A.2d at 1295).

With these principles in mind, the Court agrees that Plaintiff has adequately pled a negligence claim against Newport. The Implementation Manual appears to establish that Newport undertook a number of administrative duties with respect to Plaintiff's insurance policy. These

duties included "review[ing] current plan design, product performance, and the projected financial results associated with each plan being administered by Newport Group," (Implementation Manual *11); "the coordination of annual billings, policy service procedures, . . . and the tracking of plan additions[,]" (*id.*); and "preparation and transmittal of all corporate and individual insurance forms and applications," (*id.* *12). As an example of Newport's alleged negligence, Plaintiff asserts that Newport failed to coordinate accurate annual billings. (*See* SAC ¶ 41 ("Even as late as the Fall of 2017, when the actual Policy cash surrender value had been whittled down to approximately $3,000, Nationwide's annual statement . . . states prominently on the first page . . . that [Plaintiff's policy value] is $1,418,517.12 and Death Benefits are $5,606,178.04"). The Court finds that the alleged failure to provide the services outlined in the Implementation Manual may have foreseeably led to Plaintiff's alleged damages. The Court, accordingly, denies Newport's Motion to Dismiss as to this count.

## IV. CONCLUSION

For the reasons set forth above, the Motion is denied. The Court will enter an order consistent with this Memorandum Opinion.

/s/ Michael A. Shipp
**MICHAEL A. SHIPP**
**UNITED STATES DISTRICT JUDGE**

13